## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

THOMAS FOXX,
      Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant

Case No. 1:11-cv-209
Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and Supplemental Security Income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 13) and the Commissioner's response in

opposition (Doc. 16).

## I. Procedural Background

Plaintiff filed applications for DIB and SSI on November 2, 2005, alleging disability

since May 1, 2003, due to chronic neuropathy, reflex syndrome disorder, anxiety, depression and

sleep disorder. Plaintiff's applications were denied initially and upon reconsideration. Plaintiff,

through counsel, requested and was granted a de novo hearing before Administrative Law Judge

(ALJ) Thomas R. McNichols II. Plaintiff, a vocational expert (VE), and a medical expert (ME)

appeared and testified at the ALJ hearing. On September 1, 2009, the ALJ issued a decision

denying plaintiff's DIB and SSI applications. Plaintiff's request for review by the Appeals

Council was denied, making the decision of the ALJ the final administrative decision of the

Commissioner.

## II. Medical Evidence

### A. Physical impairments

#### 1. Hand impairment

Plaintiff was diagnosed with chronic ulnar neuropathy in March 2004. (Tr. 248). Plaintiff underwent a right ulnar nerve decompression with medial epicondylectomy in April 2004. (Tr. 246-47). Plaintiff continued to complain of pain, numbness and tingling following the procedure. (Tr. 264-69). In June 2005, plaintiff presented at the Middletown Regional Hospital emergency room complaining of right hand pain. (Tr. 374-75). Plaintiff had been out of his pain medication for one month. He described his pain as a constant sharp pain that he rated as 10 on a 1 to 10 pain scale. Plaintiff had interosseous muscle wasting of the right hand and a shiny tinge and atrophy of the skin. The emergency room physician refused to prescribe any narcotics and continued plaintiff on Neurontin and Motrin, which were the medications plaintiff had taken while incarcerated from October 2004 to May 2005, and he advised plaintiff to follow up with his pain specialist later that month. The diagnoses were (1) Reflex Sympathetic Dystrophy (RSD) of right upper extremity, and (2) "drug seeking." (Tr. 375).

Plaintiff was followed by Dr. Paul A. Kirila, D.O., at Middletown Family Practice Physicians from March to October of 2006. (Tr. 461-96). Dr. Kirila noted objective findings of atrophy of the right hand, positive Phalen's test, and positive Tinel's sign. (Tr. 493). An April 2006 EMG showed chronic severe right ulnar neuropathy, which had not changed dramatically from the March 2004 study; borderline right median neuropathy at the wrist, which was relatively unchanged from the previous study; but no evidence of cervical radiculopathy, brachial plexopathy or generalized peripheral neuropathy. (Tr. 486-89). Dr. Kirila prescribed a number

of medications, including Hydrocodone, Alprazolam, and Lyrica. (Tr. 473-74).

## 2. Back impairment

While he was incarcerated in December 2004, plaintiff complained that he felt a "pop" and began experiencing pain in his back. (Tr. 320). In March 2005, he complained of muscle spasms. (Tr. 313). Following his release from prison, plaintiff presented at the emergency room in September of 2005 for a recurrence of back pain after injuring his back while cleaning out his crawl space. (Tr. 398-403). He was diagnosed with acute low back pain and prescribed medication, including Vicodin and Valium. (Tr. 402). Plaintiff presented at the emergency room two more times in October 2005. (Tr. 422-28, 429-34). X-rays of the lumbar spine showed mild spurring present throughout; narrowing of the disc spaces diffusely, especially at L4-5 and L5-S1; and facet arthropathy at L5-S1. The impression was mild diffuse degenerative changes. (Tr. 434). Plaintiff was diagnosed with lumbar strains and prescribed Flexeril, Neurontin and Motrin. (Tr. 426, 430).

Plaintiff presented at the emergency room with a recurrence of his chronic on and off back pain in August 2007. (Tr. 536-37). Plaintiff reported lower back pain radiating down his left leg. Physical examination revealed some S1 joint tenderness on the left side, with some paraspinal tenderness in the left side musculature and spasms. (Tr. 537). Plaintiff was diagnosed with sciatica and lumbar strain, and he was prescribed medication to help with pain control to relax his muscles. (*Id*.).

Plaintiff presented at the emergency room again the following month. (Tr. 538-39). His flare-up of back pain was attributed to the fact that he had run out of pain medication. (Tr. 539). He was diagnosed with sciatica and chronic, recurrent back pain. (*Id*.). He was prescribed an

anti-inflammatory, two days of bed rest were recommended, and he was advised to follow up with his physician. (*Id.*).

Plaintiff had an MRI of the lumbar spine and an EMG to rule out radiculopathy on November 19, 2007. (Tr. 564-65). The MRI showed "[m]ultilevel disc disease is most compressive at the L4-L5 level, where there is a central herniation and facet arthropathy contributing to moderate thecal sac compression and bilateral lateral recess stenosis." (Tr. 564). The EMG was essentially normal, showing only a possible area of localized trauma. (Tr. 565).

Plaintiff's primary care physician referred him to Dr. Scott West, D.O., for an evaluation on May 30, 2008. (Tr. 567-68). Positive findings on physical examination included:

- mild palpable tenderness of the lower lumbar region
- on range of motion testing, flexion limited to 30 degrees and side bending limited to 10 degrees on the left and 15 degrees on the right
- weakness of extensor hallucis longus muscle function on the left when compared to the right
- sensory deficits involving the L5 dermatome on the left when compared to the right
- straight leg raising positive at 45 degrees on the left
- 11/9/07 MRI appeared to demonstrate a left central disc herniation at the L4-5 level with lateral recess stenosis
- impression of herniated lumbar disc with foraminal stenosis L4-5, left

Although plaintiff's MRI showed a disc herniation with some foraminal stenosis, Dr. West was hesitant to proceed with surgery because plaintiff's EMG was essentially normal. Instead, the plan was to schedule plaintiff for a series of lumbar epidural blocks and to consider a repeat MRI and a possible micro discectomy at the L4-5 level on the left only if plaintiff's symptoms showed no improvement. (Tr. 568).

Plaintiff underwent a series of three lumbar epidural injections in July, August and October 2008. (Tr. 569, 582, 591). At a follow-up visit in January 2009, plaintiff's symptoms

were unchanged, but plaintiff did not seem to be "in any kind of gross discomfort." (Tr. 570-71). Left-sided facet loading and back extension caused significant left-sided back pain, which was also present on palpation of the left facet blocks. (*Id.*). The attending physician continued plaintiff's medication and stated he would arrange for plaintiff to receive left-sided facet blocks, L2 to L5, on his next visit. (Tr. 571).

Dr. West completed a medical assessment of plaintiff's ability to do work-related activities at plaintiff's counsel's request on March 5, 2009. (Tr. 635-39). Dr. West opined that plaintiff was limited to lifting/carrying 10 pounds frequently; he could stand and walk a total of 2 hours during an 8-hour workday and for no more than 20 minutes without interruption; he could sit for a total of 2 hours during an 8-hour workday and for no more than 30 minutes without interruption; he could occasionally climb, balance, stoop, crouch, kneel and crawl; and his ability to push/pull was affected. Dr. West listed herniated lumbar disc with spinal stenosis L4-5 left as the sole medical finding supporting these functional limitations. Dr. West concluded that plaintiff did not have the RFC to perform even sedentary work on a sustained basis.

Consultative physician Dr. David K. Magnusen, M.D., a specialist in physical and rehabilitative medicine, examined plaintiff at the request of the state agency and prepared a report dated April 21, 2009. (Tr. 640-57). On physical examination, plaintiff had the ability to stand and ambulate with an assistive device, which he used to relieve pressure on his lower back and to safeguard against one of his legs buckling. (Tr. 642). There was no evidence of Trandleburg or foot drop. Plaintiff grabbed objects from the floor by using a "golfer reach." (*Id.*). Plaintiff had difficulty with squatting and extreme difficulty attempting to reach objects below his knees without having to kneel. He had some tenderness throughout the

thoracolumbarosacral paraspinal muscles, greater on the left than the right; some tenderness over the sacroiliac area; and some tenderness over the greater trochanter region on the left. Supine straight leg raise did not increase leg pain. Plaintiff complained of pain with flexion and extension of the lumbar spine. Plaintiff's range of motion of the dorsolumbar spine was restricted; internal and external rotation of both hips was reduced, left greater than the right; and he had some heel cord tightness on the left. (Tr. 642). Plaintiff reported dysesthesias with light touch over the lateral aspect of the left thigh. (Tr. 643).

On examination of the hand, plaintiff lacked terminal extension of the joints in digits 2, 3, 4, and 5 on the right. (Tr. 642). Manual muscle testing examination revealed 3/5 strength associated with finger abduction and adduction on the right. He tested 5/5 elsewhere in the upper limbs. He scored 4-4+/5 in the hip girdle and on knee flexion and extension for both lower limbs and 5/5 for both feet and ankles. Hand dynometer readings were consistently lower on the right versus the left; there was evidence of intrinsic wasting of the right hand; and there was a positive Wattenberg sign. Hand dexterity and function was abnormal on the right, and while fine coordination was intact, the ability to grasp, manipulate and pinch was diminished. (Tr. 643).

Dr. Magnusen diagnosed plaintiff with: 1) chronic axial back pain, explained by multi-level degenerative disc disease confirmed by the MRI, and some secondary myofascial pain and spasms, but with no objective findings to support a lumbar or sacral radiculopathy; 2) a probable remote injury to the lateral femoral cutaneous nerve, which was the likely cause of the chronic dyesthesias in the left lateral thigh; and 3) remote, severe left ulnar neuropathy, with severe wasting of the intrinsic muscles of the right hand, although plaintiff was not precluded from engaging in most gross motor and several fine motor tasks; 4) decreased sensation in the radial

6

aspects of the palm of his right hand which could be consistent with carpal tunnel syndrome; 5) chronic pain and narcotic dependency, which caused fluctuation in plaintiff's concentration; 6) unintentional 40-50 pound weight loss over the preceding 8 months; and 7) tiny umbilical hernia. (Tr. 643-44).

Dr. Magnusen suggested the following limitations: plaintiff can lift 10 pounds occasionally; he must avoid lifting below his knees; he can carry 20 pounds occasionally; he can sit 6 hours in an 8-hour workday but no more than 30 minutes at a time; he can stand 2 hours in an 8-hour workday but no more than 15 minutes at a time; and he can walk 1 hour in an 8-hour workday but no more than 15 minutes at a time. He would benefit from changing positions several times a day. He generally does not require the use of a cane as he does not lose his balance without it, but he uses the cane to reduce the weight on his lower back and decrease the pain. Without the cane, he can use his free hand to carry small objects, but he may require the use of his cane "for stationary objects in order to kneel to the ground." (Tr. 645, 647-48). Although the use of a cane is not medically necessary, plaintiff requires the use of a cane to ambulate and can walk 100 feet without the use of a cane. (Tr. 648). Fingering and feeling is diminished on the right, but he can perform frequent handling and occasional fingering and feeling with the right hand. (Tr. 644, 656). Dr. Magnusen explained that plaintiff is able to pick up a coin, operate a key, write, hold a cup, button, and open a door with his right hand, but he was not sure whether plaintiff would have difficulty opening a tight jar. (Tr. 653). Dr. Magnusen opined that plaintiff can occasionally climb stairs and ramps and balance, stoop, kneel, and crouch. He can never climb ladders or scaffolds or crawl, and he is restricted from exposure to unprotected heights and moving mechanical parts due to his use of narcotics and other sedating medications that may

adversely affect his safety awareness. (Tr. 645, 650).

Dr. Micah Davis, an osteopathic family physician who treated plaintiff at the Cassano Health Center between May 2008 and June 2009 (Tr. 606-34, 658-63, 672-86), completed an assessment on May 14, 2009. (Tr. 664-71). Dr. Davis diagnosed plaintiff with a more than ten-year history of chronic back pain due to degenerative disc disease, facet arthropathy, and herniated disc with radiculopathy; anxiety for which she was referring him to a psychiatrist; hypertension and hyperlipidemia; ulnar neuropathy; and current failure to thrive with weight loss. Dr. Davis opined that plaintiff's need to attend a high number of physician appointments would prohibit his regular attendance at a job. (Tr. 665). She opined that plaintiff cannot withstand the pressure of meeting normal work productivity and accuracy standards without significant risk of physical or psychological decompensation or worsening of his physical or mental impairments because he is extremely limited by pack pain, which is exacerbated by most activity, and his anxiety is worsened by new and stressful situations. Dr. Davis opined that plaintiff cannot complete a normal workday and workweek without interruptions from psychological or physical symptoms and he cannot perform at a consistent pace without an unreasonable number and length of rest periods because he is unable to walk very far or sit for prolonged periods of time due to his physical and mental problems, and his multiple medications cause fatigue. (Tr. 666). Dr. Davis opined that plaintiff cannot lift/carry any weight due to ulnar neuropathy of the right upper extremity which causes weakness and paresthesias and because he uses a cane to walk due to L4 lumbar radiculopathy, which makes him unsteady on his feet; he can stand/walk 1 hour during an 8-hour workday and 15 minutes without interruption because he has weakness and diminished reflexes of the left lower extremity, which coincides with the MRI findings and lumbar

8

radiculopathy L4; he can sit for 4 hours during an 8-hour workday and for 1 hour without interruption; and he can never climb, balance, stoop, crouch, kneel or crawl because he is unsteady on his feet due to paresthesias of the left lower extremity. Dr. Davis opined that plaintiff's ability to handle, finger, feel, and push/pull are affected by his ulnar neuropathy and lumbar radiculopathy, and that his exposure to heights, moving machinery and temperature extremes is restricted as a result of his impairments. Dr. Davis opined that plaintiff lacks the RFC to perform even sedentary work. (Tr. 667-70).

### 3. State agency physician RFC assessments

State agency physician Dr. Walter Holbrook, M.D., reviewed the file on April 10, 2006, and completed a physical RFC assessment. (Tr. 519-26). He found that plaintiff can occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, stand/walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday; his ability to push/pull is unlimited; he can occasionally climb ladders/ropes/scaffolds; and he is limited to occasional overhead reaching on the right. (Tr. 520-22). Dr. Holbrook stated that plaintiff had a lumbar x-ray in October 2005 that showed mild diffuse degenerative changes and his gait was normal. (Tr. 520). Dr. Holbrook further noted that plaintiff had some limited range of motion of the right shoulder and tingling in the fingers of his right hand, but there was no evidence of nerve damage or muscle weakness. (*Id.*). Dr. W. Jerry McCloud, M.D., affirmed Dr. Holbrook's opinion on January 3, 2007, finding there was no new medical evidence since the prior decision that would alter the RFC assessment. (Tr. 518).

### B. Mental impairments

Plaintiff was prescribed Xanax for a number of years (Tr. 371-73), and he was followed

for anxiety and insomnia at the Riverside Medical Center/Tri-State Medical Center until June 2005. (Tr. 357-373). Dr. Kirila at Middletown Family Practice Physicians diagnosed plaintiff with anxiety and prescribed Alprazolam between March and October 2006. (Tr. 464, 469, 474, 481, 485, 492, 493).

Plaintiff underwent a mental health evaluation in August 2005 after he became involved in a fight with his girlfriend and his neighbors called the police. (Tr. 437-44). Plaintiff complained of experiencing anxiety over the preceding five or six years, which had grown worse over the last few years. (Tr. 440). During the evaluation, plaintiff was cooperative, his affect was calm and appropriate, his mood was depressed, his insight and judgment were fair, his thought flow was logical, his memory was intact, his cognitive function was adequate, and his associations were normal. (Tr. 441-42). Plaintiff reported he had not received any counseling for anxiety, but he had taken Xanax for anxiety for 10 years and he wanted to continue taking it as the medication had been effective. (Tr. 441, 443). Plaintiff was diagnosed with mood disorder, NOS. (Tr. 444). Plaintiff was subsequently prescribed Seroquel in September and October of 2005. (Tr. 436).

Consultative examining psychologist Dr. Stephen Fritsch, Psy.D., prepared a report dated January 23, 2006, after conducting a clinical interview and mental status examination, reviewing the record, and administering the Wechsler Adult Intelligence Scale-III (WAIS-III). (Tr. 454-57). Dr. Fritsch noted that plaintiff was alert and attentive during the interview, but his presentation was generally lethargic and slow. (Tr. 455). Plaintiff did not show any obvious signs of anxiety during the interview. (Id.). He denied suicidal ideation, angry outbursts, or other problems with emotional behavioral control. (Id.). He had adequate psychological insight. (Tr. 456). Dr. Fritsch opined that plaintiff experiences symptoms of depression but understands his reactions are

10

secondary to escalation of medical problems and increased perception of pain. (*Id.*). Although

Dr. Fritsch did not believe plaintiff was prone to exaggeration or malingering, he found it

probable that depressive symptoms amplified plaintiff's perception of pain. (*Id.*). Dr. Fritsch

opined that plaintiff's low cognitive test scores (Verbal IQ score of 67, Performance IQ score of

59, and Full Scale IQ score of 61) "were not indicative of optimal performance" and that stress

and/or depression affected the test results. (*Id*).

Dr. Fritsch concluded as follows:

- plaintiff has the cognitive ability to understand, learn and perform simple and
repetitive tasks
- plaintiff probably would not be capable of jobs that require attention to detail, self-
direction and/or independent problem-solving
- plaintiff would have a moderate degree of difficulty maintaining optimal
concentration and persistence in the workplace
- plaintiff is likely to respond appropriately toward supervisors and coworkers if job
duties are commensurate with cognitive capability, but plaintiff does not have the
demeanor or interpersonal skills necessary to work in customer service positions
- depressive symptoms, which had escalated with worsening medical problems,
would make it moderately difficult for plaintiff to respond to job-related stress and
demands

(Tr. 457). Dr. Fritsch diagnosed plaintiff with moderate major depressive disorder; alcohol

dependence in recovery; intellectual capacity possibly in the borderline range; pain associated

with reflex sympathetic dystrophy and hypertension; and psychosocial stressors, including stress

associated with chronic pain, unemployment, loss of income and changes in occupational and

domestic role functioning. (*Id.*). Dr. Fritsch assigned plaintiff a GAF score of 59.[1] (*Id.*).

---

[1] A GAF score represents "the clinician's judgment of the individual's overall level of functioning."
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev.
2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social,
and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of
severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with
clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 51-60 as having
"moderate" symptoms. *Id.*

State agency medical consultant Alice Chambly reviewed the record and completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique form on March 11, 2006. (Tr. 500-17). She listed plaintiff's diagnoses as major depressive disorder, moderate without psychotic features; borderline intellectual functioning; and alcohol dependence in recovery. (Tr. 507, 508, 512). She indicated that plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 514). She further determined that the evidence did not establish the presence of the "C" criteria. (Tr. 515). She opined that Dr. Fritsch's assessment of plaintiff's functioning was consistent with the other evidence in the file, and she concluded: "Claimant would be able to perform 1-2 step tasks in an environment that does not require strict production quotas, pressures to perform rapidly or frequent contact with others." (Tr. 502).

Dr. Tonnie Hoyle, Psy.D., reviewed the evidence of file and affirmed the assessment of March 11, 2006, as written on January 2, 2007. (Tr. 497).

### C. Testimony by the Medical Expert

Dr. Malcolm Brahms, M.D., an orthopedic specialist, testified as a medical expert[2] at the ALJ hearing. Dr. Brahms testified that plaintiff was "limited to light activity with some limitations of his range, [and] repetitive lifting below waist level which can be done on an

---

[2]The purpose of a medical expert is to advise the ALJ on medical issues and answer specific questions about the claimant's impairments, the medical evidence, the application of the listings, and functional limitations based on the claimant's testimony and the record. *See* 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii) ("Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart. When administrative law judges consider these opinions, they will evaluate them using the rules in paragraphs (a) through (e) of this section.").

occasional basis only. [He] [n]eeds to avoid stairs, ramps, ropes, scaffolds, [and] hazardous machinery and heights." (Tr. 768). Dr. Brahms testified that plaintiff must avoid activities that require fine manipulation with the right hand but that gross activities of the hands were not limited. (*Id.*). Dr. Brahms acknowledged that spasms as reported by Dr. Magnusen would be consistent with pain and that plaintiff had limitation of motion and evidence of pain. (Tr. 770-71). Dr. Brahms agreed that plaintiff exhibited symptoms of some level of nerve root compression; plaintiff's grip strength was shown to be reduced; MRI findings would explain symptoms plaintiff experienced on an intermittent basis; and plaintiff could have psychological factors impacting his perception of his symptoms. (Tr. 772-75).

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir.

1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact

and conclusions of law:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since May 1, 2003, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: 1) chronic low back pain; and 2) chronic right ulnar neuropathy (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to: 1) alternation of sitting and standing at 30-minute intervals; 2) standing and/or walking no more than three hours per eight-hour work day; 3) no work on uneven surfaces; 4) occasional stooping, kneeling, crouching, and balancing and no crawling; 5) occasional climbing of stairs and no climbing of ropes, ladders or scaffolds; 6) occasional fingering (fine manipulation); 7) no exposure to hazards; 8) no exposure to vibrations; and 9) no requirement to maintain concentration on a single task for longer than 15 minutes at a time. By definition, light work ordinarily requires the capacity to lift 10 pounds frequently and 20 pounds occasionally and to engage in a good deal of sitting, standing or walking.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[3]

7. The claimant was born [in] . . . 1965, was 38 years old, and was defined as a "younger individual" on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. The testimony of the vocational expert was that the claimant had semiskilled work experience but that his acquired work skills did not transfer to other semiskilled work done at the light or sedentary strength range; therefore, it is found that the claimant lacks any transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

---

[3]Plaintiff's past relevant work was as a general laborer, construction worker, and lawn care worker. (Tr. 30).

10. Considering his age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[4]

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2003, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 22-31).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

---

[4]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform 4000 unskilled light jobs in the regional economy, citing as examples of such jobs small parts assembler and machine tender, and 500 unskilled sedentary jobs, citing as examples of such jobs polishing machine operator and sprayer assembler. (Tr. 31).

disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

### D. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred by giving the most weight to the opinion of the non-examining medical expert in formulating plaintiff's RFC, and (2) the ALJ erred by substituting his own opinion for the opinions of the mental health experts of record and finding that plaintiff has no limitations on his ability to perform the mental demands of work other than in the area of concentration.

### 1. The ALJ erred by giving the most weight to the opinion of the testifying medical expert in determining plaintiff's RFC.

The ALJ determined that plaintiff has an RFC for a limited range of light work, including limitations on lifting no more than 20 pounds occasionally, a need to alternate positions every 30 minutes to relieve any buildup of pain, and restrictions on standing and walking for more than three hours a day in light of his long history of leg and back pain. (Tr. 26, 28). The ALJ's RFC was less restrictive than those of the plaintiff's treating and examining physicians. In formulating the RFC, the ALJ gave "little weight" to the opinions of treating physician Dr. Davis and examining physician Dr. West. (Tr. 29). The ALJ gave "considerable weight" to the opinion of Dr. Brahms, the orthopedic medical expert who testified at the hearing, and lesser weight to the opinion of consultative examining physician Dr. Magnusen, whose functional restrictions were incorporated only in part into the RFC by the ALJ. (Tr. 27-28).

Plaintiff contends the ALJ erred by relying on the opinion of the testifying medical expert to find plaintiff could perform a limited range of light work. Plaintiff argues that Dr. Brahms' opinion conflicts with the opinions of plaintiff's treating and examining physicians; is the opinion least supported by the record; and does not constitute substantial evidence to support the ALJ's RFC finding.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Kinsella v. Schweiker,* 708 F.2d 1058, 1060 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

18

The treating physician rule mandates that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing former 20 C.F.R. § 404.1527(d)(2)).[5] If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Wilson*, 378 F.3d at 544. "Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citing former 20 C.F.R. §404.1527(d)(2)). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2p).

The opinion of a non-treating but examining source is entitled to less weight than the opinion of a treating source, but is generally entitled to more weight than the opinion of a source who has not examined the claimant. *Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing former 20 C.F.R. § 404.1527(d)(1); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). When deciding what weight to give a non-treating source's opinion, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend

---

[5]Title 20 C.F.R. §§ 404.1527 and 416.927 were amended effective March 26, 2012. The provisions governing the weight to be afforded a medical opinion were previously found at §§ 404.1527(d) and 416.927(d).

19

to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6). Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

Plaintiff asserts that the ALJ erroneously discounted the opinion of plaintiff's treating osteopathic physician, Dr. Davis, on the ground that her opinion was based primarily on plaintiff's subjective complaints and was not supported by detailed progress notes. Plaintiff contends that Dr. Davis' opinion is supported by objective findings and her conclusions are similar to those drawn both by Dr. Magnusen and Dr. West, an examining neurosurgeon, who opined that plaintiff was unable to perform even a limited range of sedentary work.

The ALJ determined that Dr. Davis' opinion was entitled to little weight to the extent it ruled out full-time work at a sedentary-light level. (Tr. 29). The ALJ stated that Dr. Davis' May 2009 functional assessment appeared to be based more on plaintiff's subjective complaints than on specific medical findings. The ALJ also found that Dr. Davis' accompanying progress notes did not describe in detail physical or mental abnormalities that would reasonably be expected to result in the marked and extreme limitations found by Dr. Davis. The ALJ concluded that Dr. Davis' opinion did not deserve "very good marks" in terms of supportability and consistency with the overall record. (Tr. 29).

The ALJ gave "good reasons" for the weight given to Dr. Davis' opinion, *see Cole*, 661 F.3d at 937, and those reasons are substantially supported by the evidence of record. While Dr.

20

Davis listed particular medical findings in support of her assessment,[6] the findings Dr. Davis listed are largely absent from her treatment notes. The notes make little mention of plaintiff's arm and back impairments, and there is no indication in the treatment notes that Dr. Davis performed any examination or testing of plaintiff's right arm or back. (Tr. 606-34, 658-63, 672-86). Moreover, the ALJ reasonably rejected Dr. Davis' finding that plaintiff is restricted from all lifting and carrying because he uses a cane. Dr. Davis' treatment notes include no objective findings showing plaintiff required the use of a cane, and the record does not show that either Dr. Davis or any other medical provider ever prescribed a cane for plaintiff. Finally, while Dr. Davis did consistently diagnose plaintiff with anxiety for which she prescribed Klonopin and Xanax (Tr. 606, 611, 615, 617, 620), there is no indication in her treatment notes that plaintiff's anxiety might "be a significant source of disability" as Dr. Davis surmised in her assessment. (Tr. 671). Thus, the ALJ did not err by giving little weight to Dr. Davis' functional assessment.

Nor did the ALJ err by giving little weight to the opinion of Dr. West (Tr. 29), a neurosurgeon who examined plaintiff on May 30, 2008, at the request of plaintiff's family physician and then subsequently completed a functional capacity evaluation form at the request of counsel in March 2009. (Tr. 567-68, 635-39). Dr. West opined that plaintiff was precluded from performing even sedentary work on a full-time basis due to a herniated lumbar disc with spinal

---

[6]Dr. Davis stated that plaintiff has weakness and paresthesias of the right upper extremity due to ulnar neuropathy, and the decreased sensation in his right hand affects his ability to handle, finger, push and pull; he is unsteady on his feet due to paresthesias of the left lower extremity and due to lumbar radiculopathy, as shown by the MRI findings; and he cannot lift or carry any weight because he uses a cane to walk. (Tr. 667-69). In addition, Dr. Davis stated that plaintiff's multiple medications cause fatigue and require multiple rest periods. (Tr. 666). She further found plaintiff could not "[w]ithstand the pressure of meeting normal standards of work productivity and work accuracy without significant risk of physical or psychological decompensation or worsening of [his] physical and mental impairments" because he is "extremely limited by back pain which is exacerbated by most activity" and he has "anxiety which is worsened by new/stressful situations." (*Id.*).

21

stenosis L4-5, left side. (Tr. 635, 639). The ALJ properly determined that because Dr. West only consulted with plaintiff on one occasion and was not a treating source, his opinion was not entitled to controlling weight. (Tr. 29). The ALJ gave Dr. West's opinion little weight because he rendered his functional opinion 10 months after he saw plaintiff, and his "pessimistic" functional assessment in March 2009 seemed inconsistent with his finding of a normal EMG and his recommendation of conservative treatment in May 2008. The ALJ reasonably decided to discount Dr. West's functional assessment on this ground, and there is no basis for disturbing the ALJ's decision in this regard.

However, insofar as the ALJ discounted the opinion of consultative examiner Dr. Magnusen and relied instead on the contrary conclusions of the medical advisor, Dr. Brahms, substantial evidence does not support the ALJ's decision. The ALJ gave "considerable weight" to Dr. Brahms' testimony over the opinion of Dr. Magnusen in formulating the RFC. The ALJ reasoned that Dr. Brahms has expertise in orthopedic medicine[7]; his assessment was "well-supported by a detailed analysis of the medical history and pertinent medical findings"; and his opinion was "more consistent" with plaintiff's "functioning in daily activities." (Tr. 27).

Medical expert testimony consistent with the evidence of record can constitute substantial evidence to support the Commissioner's decision. *Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989). "A non-examining physician's opinion may be accepted over that of an examining physician when the non-examining physician clearly states the reasons that

---

[7]While plaintiff argues that the ALJ erred by not recognizing Dr. Magnusen was a physiatrist, *e.g.,* an expert in physical medicine and rehabilitation, who was "on the same footing" as Dr. Brahms based on expertise, plaintiff has not cited any authority to support this proposition. In any event, the ALJ's opinion reflects that Dr. Magnusen is a physical medicine specialist. (Tr. 23).

his opinions differ from those of the examining physicians." *Lyons v. Social Security Admin.*, 19 F. App'x 294, 302 (6th Cir. 2001) (citing *Barker*, 40 F.3d at 794-95) (ALJ was entitled to accept non-examining medical advisor's opinion as to the severity of the plaintiff's impairments where, to the extent the medical advisor's conclusions differed from those of the examining psychologist, the medical advisor explained his position by reference to the objective medical and psychological reports in the plaintiff's file, as well as the undisputed facts concerning the plaintiff's prior work and social history).

In the instant case, the ALJ failed to elicit any explanation from Dr. Brahms as to why he thought plaintiff was not as restricted as opined by Dr. Magnusen. Dr. Magnusen had the benefit of not only reviewing the diagnostic studies upon which Dr. Brahms relied, but also of performing a detailed physical examination of plaintiff as well. A review of Dr. Brahms' testimony discloses that although he explicitly disagreed with Dr. Magnusen concerning the extent of plaintiff's functional limitations (Tr. 774-75), Dr. Brahms neither explained why he disagreed with Dr. Magnusen's assessment nor pointed to objective evidence in the record to explain the conclusions he reached. To the contrary, the record shows that Dr. Brahms confirmed the objective findings on which Dr. Magnusen relied, and Dr. Brahms agreed that those objective findings could produce the symptoms noted in the reports of record. Dr. Brahms testified that a November 2007 MRI revealed "multiple levels of degenerative changes" and some stenosis of the lateral recesses on both the right and left side at the L4-5 level, there was decreased sensory perception in the right thigh, and there were possibly symptoms of nerve root compression. (Tr. 768, 772). Dr. Brahms acknowledged that plaintiff's back impairment would restrict his lifting to some extent by opining that plaintiff was "limited to light activity with some limitations of his range, repetitive lifting

below waist level which can be done on an occasional basis only." (Tr. 768). In addition, Dr.

Brahms acknowledged that Dr. Magnusen had reported spasms, which would be consistent with

significant intermittent pain (Tr. 770), and he agreed with Dr. Magnusen that the multi-level

degenerative disc disease as confirmed by the 2007 MRI "without question" would explain

plaintiff's symptoms "intermittently." (Tr. 773). Dr. Brahms opined that if a patient reported the

level of symptoms plaintiff had reported and which were noted in the record, Dr. Brahms would

not question the patient's report of those symptoms as being "truly perceived." (Tr. 774). Yet,

when asked whether he agreed with Dr. Magnusen's conclusions that plaintiff could tolerate

standing and walking up to 15 minutes at a time and 1-2 hours in an 8 hour workday, sitting 30

minutes at a time and up to 6 hours in an 8-hour workday, lifting 10 pounds occasionally, and

fingering and feeling occasionally, Dr. Brahms answered he did not. (Tr. 774-75). Dr. Brahms

did not offer any explanation as to why he disagreed with these conclusions. (*Id.*). Nor did he cite

any evidence in the record that he believed to be inconsistent with the functional limitations found

by Dr. Magnusen. (*Id.*). Thus, the record is not clear as to why Dr. Brahms disagreed with Dr.

Magnusen and in what respects Dr. Brahms found the objective evidence to be inconsistent with

Dr. Magnusen's findings.

In addition, the ALJ's conclusion that Dr. Brahms' assessment was "well-supported by a

detailed analysis of the medical history and pertinent medical findings" is without substantial

support in the record. In reality, Dr. Brahms only briefly discussed the objective findings

associated with plaintiff's hand impairment (Tr. 767-68), and noted only the November 2007 MRI

findings and "decreased sensory perception in [the] right thigh" in "analyzing" plaintiff's back

24

impairment, without discussing any of the other clinical or objective evidence in the record.[8] (Tr. 768). Although on cross-examination Dr. Brahms did express his disagreement with Dr. Magnusen's assessment, as discussed above, his testimony fails to reflect the reasons for the difference in his opinion.

Finally, the ALJ's finding that Dr. Brahms' opinion was "more consistent" with plaintiff's "functioning in daily activities" (Tr. 27) is without substantial support in the record. While the ALJ noted that plaintiff shared some household responsibilities with his wife, liked to attend his son's baseball games, shopped at the grocery, watched television, and read (Tr. 29), plaintiff's actual testimony showed he was much more limited. Plaintiff testified he spends most of his day in and out of his recliner chair with a heating pad (Tr. 734, 745); he can only wash dishes if he does so "very slowly" (Tr. 735); he is unable to sweep, mop, or vacuum without hurting his back (Tr. 735); he is able to throw some clothes into the laundry but he does not make beds (Tr. 735); and if he does laundry, he just does a little bit at a time and then has to sit down to rest (Tr. 744). The ALJ failed to explain how these daily activities were consistent with Dr. Brahms' opinion.

In sum, the Court finds that although the ALJ's decision giving little weight to the opinions of treating physician Dr. Davis and examining physician Dr. West is substantially supported, his decision to credit the opinion of Dr. Brahms over that of Dr. Magnusen in formulating plaintiff's RFC does not find substantial support in the record. (Tr. 26-27). Dr. Brahms failed to clearly state the reasons his opinion differed from that of the examining physician, Dr. Magnusen, and to explain his position by reference to the objective and clinical

_____

[8]Dr. Brahms did note he reviewed the RFC for medium work given by the state agency physician, but merely stated, "I disagree with that." (Tr. 768).

25

medical evidence of record. Thus, substantial evidence does not support the ALJ's RFC finding

for a range of light work. *See Lyons*, 19 F. App'x at 302. Plaintiff's first assignment of error

therefore should be sustained.

**2. The ALJ did not err in assessing the functional impact of plaintiff's mental impairment.**

Plaintiff alleges as his second assignment of error that the ALJ erred by relying on his own

interpretation of the record to make the following improper assessment of the limiting effects of

plaintiff's mental impairment on his functional capacity:

> Considering the combined effects of his preoccupation with pain, the sedative
> effects of his medication and residuals of past substance abuse, and mild symptoms
> of depression or anxiety, he is further limited to work that does not require
> concentration on a single task for longer than 15 minutes at a time.

(Doc. 13 at 19-20, citing Tr. 28). Plaintiff contends that the ALJ's finding is erroneous because

the record documents more than "mild symptoms of depression or anxiety" and demonstrates that

plaintiff's mental limitations go beyond limitations in the area of concentration. Plaintiff

contends that the consultative examining psychologist, Dr. Fritsch, found that he suffers from a

moderate major depressive disorder that would, in combination with plaintiff's pain, not only

limit plaintiff's concentration but also limit plaintiff to simple and repetitive tasks and make it

moderately difficult for plaintiff to respond to job-related stress and demands. (Doc. 13 at 19,

citing Tr. 457). Plaintiff further notes that Dr. Fritsch found plaintiff lacked the interpersonal

skills to work in customer service positions. (*Id.*). In addition, plaintiff notes that the state agency

reviewing psychologist, Alice Chambly, concluded that plaintiff "would be able to perform 1-2

step tasks in an environment that does not require strict production quotas, pressures to perform

rapidly or frequent contact with others." (*Id.* at 20, citing Tr. 502). Plaintiff contends that the

ALJ erred by substituting his own opinion for the opinions of these mental health experts. (*Id.* at 20).

The Commissioner contends that the ALJ's assessment of plaintiff mental functional capacity is supported by substantial evidence. The Commissioner contends that the ALJ reasonably relied on a number of factors to determine that plaintiff's claim of a disabling mental impairment was not credible and was not supported by the evidence of record. (Doc. 16 at 16-20).

The sequential evaluation analyses outlined in 20 C.F.R. §§ 416.920 and 404.1520 apply to the evaluation of mental impairments. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three. *Rabbers*, 582 F.3d at 652 (citing 20 C.F.R. § 404.1520a(a)). At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Id.* at 652-53 (citing 20 C.F.R. § 404.1520a(b)(1)). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment" in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id.* at 653 (citing 20 C.F.R. §§ 404.1520a(b)(2), (c)(3)). The degree of limitation in the first three functional areas is rated using the following five-point scale: none, mild, moderate, marked, and extreme. *Id.* (citing 20 C.F.R. § 404.1520a(c)(4)). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: none, one or two, three, four or more. *Id.* If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id.* (citing § 404.1520a(d)(1)). Otherwise, the impairment is considered severe and the

27

ALJ will proceed to step three. *Id.* (citing § 404.1520a(d)(2)).

In this case, the ALJ determined there was insufficient evidence to show that plaintiff suffers from a severe mental impairment. The ALJ found that plaintiff's medically determinable mental impairments are non-severe because they cause no more than mild limitations in any of the first three functional areas described in the regulations and no episodes of decompensation of an extended duration in the fourth area. *See* §§ 404.1520a(d)(1), 416.920a(d)(1). (Tr. 26). In making his determination, the ALJ discounted the assessments of examining psychologist Dr. Fritsch[9] and the state agency reviewing mental health experts, Alice Chambly and Dr. Tonnie Hoyle, who found moderate impairment of mental functioning. (Tr. 25). The ALJ determined that the weight of the evidence did not provide a credible basis to support a significant loss of function due to a mental impairment. (*Id.*). Nonetheless, the ALJ considered plaintiff's mental impairment in formulating the RFC.[10] (Tr. 26-28).

The ALJ's determination as to the functional limitation imposed by plaintiff's mental impairment finds substantial support in the record. It is the responsibility of the ALJ to formulate the RFC, *see* 20 C.F.R. §§ 404.1546(c), 416.946(c), and the ALJ complied with the Social Security regulations in fulfilling his responsibility. The ALJ reviewed the longitudinal evidence of plaintiff's mental impairment. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (D)(2) (recognizing the

---

[9]The ALJ mistakenly referred to Dr. Fritsch as Dr. Boerger in certain parts of his opinion. (Tr. 25).

[10]As plaintiff implicitly concedes (Doc. 13 at 19, n.4), even if the ALJ erred by not finding plaintiff's mental impairments to be severe, that error would be harmless. If an ALJ considers all of a claimant's impairments (both severe and non-severe) in determining the claimant's RFC, the ALJ's failure to characterize additional impairments as "severe" is not reversible error. *See McClanahan v. Commissioner of Social Sec.*, No. 1:09-cv-746, 2011 WL 672059, at *4 (S.D. Ohio Feb. 16, 2011) (Barrett, J.) (citing *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). As the ALJ in this case found a severe impairment and proceeded to consider all of plaintiff's impairments, severe and non-severe, in the remaining steps of the sequential evaluation process, any erroneous assessment of plaintiff's mental impairments would be harmless.

need for longitudinal evidence in a mental impairment case and further recognizing that an individual's level of functioning may vary considerably over time). The ALJ acknowledged that plaintiff had been prescribed medication for anxiety and insomnia over time (Tr. 24, citing Tr. 357-73); he had been evaluated at a mental health clinic in August 2005 because of his history of depression and substance abuse (*Id*., citing Tr. 435-44); he had complained to Dr. Fritsch in 2006 about becoming increasingly depressed since completing his last prison term (*Id*., citing 454-57); and his treating osteopathic physician, Dr. Davis, reported in May 2009 that plaintiff's mental health may be a significant source of disability and that plaintiff had recently started care at a mental health facility. (Tr. 25, citing Tr. 671). However, the ALJ adequately explained why the record did not show plaintiff to be limited to the extent found by the examining and reviewing mental health experts; he articulated the basis for his opinion; and he linked his RFC determination with specific evidence in the record in accordance with Social Security Ruling 96-8p, 1996 WL 374184 (1986) ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)."

First, the ALJ discounted the assessments rendered by the state agency mental health experts and determined there was no credible basis to find any significant functional loss due to a mental impairment. (Tr. 25). The ALJ found that while plaintiff had expressed subjective complaints of anxiety or depression from time to time, plaintiff had failed to stay in counseling or other treatment with a mental health clinic except on a short-term or sporadic basis, and he had only recently gone into counseling. (*Id*.).

In addition, the ALJ discounted Dr. Fritsch's findings of moderate impairment because the

29

ALJ found Dr. Fritsch's report to be internally inconsistent and ambiguous in the following respects: (1) the IQ scores were not valid and were an underestimate of plaintiff's true ability; (2) plaintiff was described as alert and attentive, yet lethargic; (3) despite plaintiff's alleged mental difficulties, Dr. Fritsch thought he could respond appropriately to co-workers and supervisors; and (4) Dr. Fritsch noted that plaintiff had apparently displayed appropriate judgment in daily activities. (*Id.*). The ALJ further noted that during his exam, Dr. Magnusen had made observations which were inconsistent with the findings of Dr. Fritsch in that Dr. Magnusen had described plaintiff as pleasant and conversive, he did not sense any overwhelming anxiety or depression, and he observed that plaintiff was able to maintain normal attention and concentration throughout the exam. (Tr. 25, citing Tr. 642).

The ALJ further determined that any evidence of cognitive difficulties was either inconsistent or untrustworthy. (Tr. 25). As the ALJ reasonably noted, plaintiff downplayed the extent of his substance abuse and any "drug-seeking" behavior, which was well-documented throughout the record (Tr. 340, 350, 375, 437-39, 455, 620), although the ALJ found that plaintiff's long history of substance abuse would contribute to some difficulty maintaining concentration on a single task for long periods of time. (Tr. 25-26). In addition, plaintiff's activities appeared to be primarily limited by pain or physical concerns, and plaintiff participated in some chores and social activities. (Tr. 25). The ALJ found based on this evidence that from a mental standpoint, plaintiff was no more than mildly limited in activities of daily living, social functioning, and the ability to maintain concentration, persistence or pace, and there was no credible evidence of recurrent episodes of mental decompensation of extended duration. (Tr. 26). The ALJ also found no evidence that plaintiff would decompensate if mental demands on him

30

were minimally increased or if there were a change of environment. (*Id.*). Nonetheless, the ALJ reasonably accommodated plaintiff's preoccupation with pain, side effects from medication, and other symptoms that may affect his ability to maintain concentration by limiting him to jobs that do not require him to maintain concentration on a single task for more than 15 minutes at a time. (Tr. 26).

It is clear from a review of the ALJ's decision that, contrary to plaintiff's argument, the ALJ did not arbitrarily substitute his opinion concerning plaintiff's mental functional capacity for the opinions of the mental health experts in this case. Rather, the ALJ reviewed the record and discussed the specific evidence he relied upon to determine the extent of plaintiff's functional limitation resulting from his mental impairment. Although the ALJ determined that plaintiff does not suffer from a severe mental impairment, the ALJ nonetheless took the functional limitation resulting from plaintiff's mental impairment into account in formulating the RFC. Plaintiff's second assignment of error therefore should be overruled.

### III. This matter should be remanded for further proceedings.

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date. *See Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). This matter should be remanded to the Commissioner for reconsideration of plaintiff's RFC and the weight to afford the opinions of plaintiff's examining physician, Dr. Magnusen, and the medical expert, Dr. Brahms, and to obtain additional medical testimony and vocational evidence as warranted.

31

**IT IS THEREFORE RECOMMENDED THAT**:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence

Four of 42 U.S.C. § 405(g).

Date: 4/17/2012

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

THOMAS FOXX,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-209
Barrett, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).